**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | |
| DEE LYNN ANDREWS | : | NO. 09-261 |
| | : | |
| | : | |

**September \_\_\_ , 2011**                                                                 **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

The Government has moved *in limine* to exclude from trial psychiatric or psychological

evidence offered by the Defendant, Dee Lynn Andrews, for the purpose of negating the mens rea

element of the offenses for which she is charged, namely the specific intent to defraud. For the

reasons set forth below, I will grant the motion.

**I.      Background**

On April 21, 2009, a federal grand jury returned a six-count indictment charging

Andrews with three counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1349 and three

counts of wire fraud in violation of 18 U.S.C. §§ 1343, 1349. According to the indictment,

Andrews "devised and intended to devise a scheme to defraud . . . and to obtain money and

property . . . by means of knowingly false and fraudulent pretenses, representations and

promises." Indictment ¶ 16. The details of that alleged scheme are as follows.

**A.  Fen-Phen Litigation**

Pondimin and Redux were prescription diet drugs, distributed by doctors and weight loss

clinics. *Id.* ¶ 1. When Pondimin or Redux was taken in combination with Phentermine, the drug

was known as "Fen-Phen." *Id.*

On September 15, 1997, American Home Products Corporation (later known as Wyeth) removed these drugs from the market. *Id.* ¶ 2. Those who had ingested them had filed individual and class action lawsuits in federal and state courts, alleging that the drugs had resulted in injury, including heart valve regurgitation and valvular heart disease. *Id.*

On December 10, 1997, the Judicial Panel on Multidistrict Litigation transferred all federal cases to the United States District Court for the Eastern District of Pennsylvania. *Id.* ¶ 3. On August 28, 2000, the court approved a settlement agreement between the class and Wyeth. *Id.* ¶ 4.

The settlement agreement established a trust to administer the claims of and pay benefits to class members. *Id.* ¶ 6. Wyeth supplied the trust with funds to pay these benefits and cover the associated administrative costs. *Id.*

To be eligible for basic benefits under the settlement agreement, an individual had to have ingested the diet drugs and registered with the trust. *Id.* ¶ 8. Registration with the trust required the submission of a blue or pink form to the trust. *Id.* Greater benefits were available to those with serious levels of valvular heart disease, and could be claimed by additionally submitting a green form to the trust. *Id.* ¶ 10. Alternatively, class members could opt out of the settlement agreement and preserve their rights to sue by submitting orange forms to the trust. *Id.* ¶ 12.

### B.  Andrews' Conduct

Andrews took Pondimin from approximately 1994 until 1997. Resp. 4. On October 4, 2000, Andrews filed a lawsuit under the name Debra Simpson against Wyeth, alleging that she had ingested the diet drug Pondimin, and seeking damages. Indictment ¶ 14. On January 19, 2001, Andrews entered into a settlement agreement with Wyeth, pursuant to the terms of which

she received approximately $200,000 and promised not to sue Wyeth for any claim arising out of her purchase, use, or ingestion of Pondimin or Redux. *Id.* ¶ 15.

Notwithstanding her promise not to sue, Andrews subsequently filed multiple claims in multiple fora against Wyeth, seeking additional damages. Andrews retained several different law firms, and failed disclose to each the existence of the others. She represented to each firm that she had ingested Fen-Phen and had not previously filed or settled a suit against Wyeth, and used different names for each claim. *See id.* ¶¶ 17-19. During the filing of these claims, Andrews exchanged several correspondences with her lawyers and the trust. Several significant communications between Andrews, her lawyers, and the trust are highlighted here.

For example, on May 27, 2002, Defendant, under the name Debra Andrews, submitted a blue form to Law Firm No. 1, which was forwarded to the trust on July 23, 2002. Indictment ¶ 22; Mot. 6.

On July 31, 2002, Defendant, under the name Deb S. Simpson, submitted another blue form to the trust, identifying Law Firm No. 2 as her counsel of record. Indictment ¶ 23; Mot. 7.

On December 31, 2002, Defendant, under the name De Lynn A. Campbell, completed another blue form, identifying Law Firm No. 3 as her counsel of record. Indictment ¶ 24; Mot. 7. She represented to Law Firm No. 3 that she had never previously received any money from any source for her Fen-Phen claim. Indictment ¶ 24; Mot. 7. She then mailed this blue form to Law Firm No. 3 on January 10, 2003. Indictment ¶ 25; Mot. 7. On March 31, 2004, Defendant, under the name DeLynn Campbell, caused Law Firm No. 3 to file a civil complaint against Wyeth in the Superior Court of New Jersey. Indictment ¶ 26; Mot. 7-8.

On January 31, 2003, Defendant, under the name D. Lynn Andrews, caused Law Firm No. 5 to submit an orange form to the trust, certifying that she was qualified to exercise an opt-

out right under the settlement agreement. Indictment ¶ 28; Mot. 8. That same day, Law Firm No. 5 filed a civil complaint in the Philadelphia Court of Common Pleas against Wyeth. Indictment ¶ 31; Mot. 8-9.

On April 25, 2003, Defendant, under the name Deborah L. Andrews, caused Law Firm No. 4 to submit an orange form to the trust, certifying that she was qualified to exercise an opt-out right under the settlement agreement. Indictment ¶ 27; Mot. 8.

On May 6, 2003, Defendant, under the name Debra L. Andrews, caused Law Firm No. 5 to mail another orange form to the trust. Indictment ¶ 32; Mot. 9. That same package included a blue form under the name of D Lynn L. Andrews. Indictment ¶ 32; Mot. 9-10.

On March 31, 2004, Defendant, under the name Deb. L. Andrews, received $61.00 from the trust. Indictment ¶ 33; Mot. 10.

On April 26, 2004, Defendant, under the name Lynn Andrews, caused Law Firm No. 6 to file a civil complaint in the Philadelphia Court of Common Pleas against Wyeth to recover for damages suffered as a result of ingestion of diet drugs. Indictment ¶ 35; Mot. 10.

Also on April 26, 2004, Defendant, under the name Deb L. Andrews, wrote to the trust to request a green form, which would enable her to obtain greater benefits from the trust. Indictment ¶ 34; Mot. 10.

On July 8, 2005, Defendant appeared for a deposition in Philadelphia, represented by Law Firm No. 5. Indictment ¶ 40; Mot. 11. On August 30, 2005, Defendant returned to Philadelphia to complete her deposition, and was again represented by Law Firm No. 5. Indictment ¶¶ 43-44; Mot. 11. At that time, counsel for Wyeth presented Defendant with the signature page of her 2001 settlement with Wyeth, pursuant to which she received $200,000 and agreed not to sue again. Mot. 12. Defendant's response was, "Shit." *Id.*

According to the indictment, the specific instances of mail fraud were as follows:

> On April 26, 2004, Andrews requested a green form from the trust.
> On May 17, 2004, Andrews' law firm filed a complaint against Wyeth.
> On August 25, 2005, Wyeth noticed Andrews' deposition.

The specific instances of wire fraud were:

> On July 7, 2005, Wyeth faxed an amended deposition notice.
> On July 8, 2005, Andrews' attorney participated by telephone in her deposition.
> On August 30, 2005, Andrews' attorney participated by telephone in the continuation of her deposition.

## A.  Andrews' Medical History

Andrews is a 59-year-old woman with a history of psychiatric treatment. Resp. 3. She was first hospitalized at the age of thirteen and is most consistently labeled as suffering from Bipolar Disorder Type I. *Id*. at 3-4. In 1997, Andrews was evaluated at Manatee Memorial Hospital for acute psychosis. *Id.* at 4. In February of 2001, she was treated at Blake Medical Center, which noted that she had a history of bipolar disorder and seizures. *Id.* On September 14, 2002, Andrews was taken to Paradise Valley Hospital for emergency services, where she admitted that she had been off her bipolar medication for a week. *Id.*

On September 20, 2002, Andrews' son called Value Options, a behavioral health care provider, to state that Andrews was going to miss an appointment. Gov't Ex. 1 at 3. He explained that Andrews was incoherent, off of her Lithium, and needed to be seen psychiatrically. *Id.* Andrews' son then took her to Thunderbird Samaritan Medical Center, where a doctor wrote that she had "been taking numerous medications including narcotic pain medications and benzodiazepines," "was emotionally labile and pressured in her speech," "was markedly confused and delirious," "was not able to function," and "had not eaten for 1-2 weeks." Gov't Ex. 3 at 2. The record of this visit also indicates that Andrews was "shouting, crying,

extremely agitated, and irritable" on admission, and she was initially diagnosed with delirium. *Id.* at 3. Andrews then gave a urine sample, which came back positive for barbiturates, benzodiazepines, opiates, and propoxyphene. *Id.* at 2.

On September 22, 2002, the notes from Value Options state that Andrews was "depressed, with rapid and pressured speech, disorganized, confused, with labile moods." Gov't Ex. 1 at 3. She was also "refusing treatment at [Thunderbird] and want[ed] to leave against doctor[']s orders." *Id.* Throughout her stay, Thunderbird employees wrote that she remained "a little manic." However, upon discharge, employees observed Andrews to be "awake, alert, and well oriented to time, place, and person," with normal speech and motor activity, a slightly irritable mood, and limited insight and judgment. Gov't Ex. 3 at 3. Andrews was discharged on September 28, 2002. *See id.* at 2-4.

On March 26, 2003, Andrews called Value Options because she was out of Lithium and Valium, and reported depression. Gov't Ex. 1 at 4.

On April 29, 2003, Andrews visited the Mayo Clinic Scottsdale's Emergency Department because she had fallen while walking to the bathroom, and she was concerned that she may have had a seizure, as she had been out of her seizure medication for five days. Gov't Ex. 4 at 5. Andrews reported that she had been out of her Lithium, Valium, and Phenobarbital for the same amount of time. *Id.* The medical records from this visit also state that Andrews was "alert" and "oriented times two." She appeared "to be in significant discomfort" and had quite "bizarre affect" but answered "all of her questions appropriately." *Id.* at 8.

On June 29, 2003, Value Options reported that Andrews displayed slurred speech and spoke in a "tangential, tearful, high pitched tone." Gov't Ex. 1 at 5. Andrews stated that she had

a PhD in marketing from the University of Michigan. *Id.* at 5. On August 28, 2003, Andrews "appeared manic," with "rapid, pressured speech, and she was tangential." *Id.* at 6.

On September 8, 2003, a Value Options representative completed a special needs evaluation at Andrews' home. *Id.* at 8. According to the "Adult Intake Assessment" resulting from that visit, Andrews' chief complaint was that she had been depressed since stopping her psychiatric medications. Gov't Ex. 4 at 23. However, during the evaluation, Andrews' complaints were inconsistent. She contradicted herself repeatedly by stating, for example, that she was depressed yet not depressed, and sleeping yet not sleeping. *Id.* Andrews also reported at one point that she had felt better since stopping her medication, while claiming at other times that she had been very depressed since quitting her Lithium. *Id.* at 24. She was "vague about her current treatment, what medications she [was] taking, and when/why she stopped taking the medications" and "unreliable in reporting her symptoms and time frames." *Id.* at 11, 13. Andrews was also grandiose about her current employment. *Id.* at 11. Overall, "[d]uring the assessment, [Andrews'] speech was rapid, and [her] thought processes were extremely loose and tangential, therefore she had difficulty answering questions appropriately." *Id*. at 23. The evaluator found her "alert, engaging," "very talkative," but "loose and tangential in her thoughts." *Id.* at 12. Andrews "spoke loud and above the evaluator asking questions," "was unable to stay on topic, and needed a lot of redirection," and had "labile and inappropriate" affect. *Id.* at 13.  Lastly, her "affect was incongruent." *Id.*  For instance, Andrews spoke of her depression "while smiling and laughing." *Id.* Soon after this evaluation, Arizona granted Andrews Seriously Mentally Ill ("SMI") status, which entitled her to case management, psychiatric treatment, social support, medication support, and vocational training and assistance. Def. Ex. 11 at 4, 10.

On January 8, 2004, Value Options reported that Andrews was "stable." Gov't Ex. 1 at 14. On May 3, 2004, Andrews "presented polite and professional." *Id.* at 21. On March 25, 2005, Andrews "sounded upbeat, alert and oriented," and was "able to communicate effectively." *Id.* at 38. On March 31, 2005, Andrews was "dressed, groomed, alert and oriented." *Id.* at 39. She "was able to communicate effectively, tangential in thought, blunted affect." *Id.* Similarly, on April 22, 2005, Andrews was "alert and oriented, groomed, [and] able to communicate effectively." *Id.*

## B. Expert Opinions

On March 2, 2010, Defendant filed notice pursuant to Federal Rule of Criminal Procedure 12.2 of her intention to introduce at trial expert testimony as to her mental condition. *See* Notice, ECF No. 19. On February 2, 2011, Defendant produced the expert reports of Dr. Shelley Uram and Dr. Carol Armstrong. *See* Mot. 2.

### 1. Reports

Dr. Uram, a psychiatrist, evaluated Andrews on December 12, 2007, and April 16, 2008. Def. Ex. 11 at 1. Her "diagnostic impressions" included Bipolar I Disorder, a history of polysubstance abuse, Impulse Control Disorder, Borderline Personality Disorder, Antisocial Personality features, and Grand Mal Seizure Disorder. *Id.* at 9. At the end of her report, Dr. Uram concluded:

> It is the undersigned psychiatrist's clinical opinion, that during and in between her psychotic episodes, [Andrews] had long periods of time with a very impaired mental status. Some of the treatment records reflected her illness significantly interfered with her judgment, and impulse control. It is further my opinion that the combination [of] her severe mental illness and substance abuse significantly clouded her consciousness over a several year period. All of this pathological psychiatric symptomatology overlapped with the years she was filing Fen/Phen lawsuits.

If she had periods of time where she was able to form an intent to wrongfully file lawsuits, she was concurrently suffering from very impaired judgment and impulse control problems, all secondary to psychotic and manic symptoms. Her substance abuse also likely contributed to her clouded consciousness.

Ms. Andrews also has Antisocial Personality Features. However, her antisocial behaviors during the years of her lawsuit filings were highly related to her severe psychiatric symptoms. Since 2006, when she stopped abusing pain medications and has been more compliant with her psychiatric medications, she has been much more functional in her life. She has been able to be more "in touch with" her impact upon others, and takes more responsibility for her behaviors.

*Id.* at 10. Finally, Dr. Uram opined that "[i]f one cross indexes her lawsuit filings with her psychiatric symptoms/hospitalizations/treatment history, there is a [very] significant overlapping of severe psychiatric disturbances with her unlawful behavior." *Id.* at 9.[1]

The defense's other expert, Dr. Armstrong, a neuropsychologist, evaluated Andrews on January 24, 2010. She found that Andrews' "neuropsychological impairments were severe or very severe in":

1. Motor function…;
2. Information processing: consistently very slowed;
3. Selective attention: both visual and auditory very abnormal showing tendency to miss important, target information;
4. Divided attention: so difficult for Ms. Andrews that she was unable to perform the task;

5. Reversal of visuospatial patterns (borderline impaired for reversal of numbers);
6. Associative memory: ability to learn a list of words showed reliance on primary and recency recall;

---

[1] Dr. Uram provides the following as examples of the overlap:
- Early 2003 – [Andrews] filed another lawsuit against American Home Products/Wyeth.
- Several months later, she is psychiatrically hospitalized, and it is noted that she had not been taking her medications; her symptoms had been present chronically; and her symptoms were worsening over many months. They noted "(Her) speech was rapid, and thought processes were extremely loose and tangential, therefore she had difficulty answering questions appropriately." Her medications for bipolar and psychotic symptoms were restarted.
- Soon after, she was granted Severely Mentally Ill ("SMI") status from the State of Arizona. They noted that "her functional status is profoundly impaired."
- A few months later, she filed a Fen/Phen suit against Wyeth. Her medical records around this time reflect her missing several psychiatric appointments, and some inconsistency in taking her medications; sometimes too much and other times too little.

*Id.* Dr. Uram then wrote, "This pattern is fairly consistent throughout the years she had filed lawsuits." *Id.* In responding to questions about this perceived overlap at the hearing, Dr. Uram retracted some of her support for a correlation. *See* Hr'g Tr. 61, June 21, 2011.

7. Visuospatial gnosia: consistent problems in tasks requiring discrimination and manipulation of visuospatial material, including object recognition errors in an object naming task;
8. Visuospatial working memory;
9. Visuospatial recall from memory;
10. Control of impulsivity with full attention and effort.

Def. Ex. 2 at 1. Dr. Armstrong also found "[m]ild and moderate impairments" in:

1. Retrieval of verbal material after distracters;
2. Logical reasoning;
3. Cognitive flexibility;
4. Abstract verbal reasoning.

*Id.*

By contrast, the Government's expert, Dr. Michals, who evaluated Andrews on August 4, 2010, came to the following conclusions:

> [A]t the time of the criminal charges that Ms. Andrews is facing, she was not insane or suffering from any mental disease or defect and was able to appreciate the nature and quality and the criminality and wrongfulness of her actions. The results of the psychological testing raise questions concerning the accuracy and reliability of her self-report. The medical records during the timeframe of her alleged criminal offenses did not identify that she was limited by her Bipolar Disorder. She also had a history of substance abuse. During that timeframe, she was able to organize, establish and operate her ticket agency. Ms. Andrews claimed many educational degrees, including a law degree. In addition, the records did not identify the presence of any brain injury nor was her behavior consistent with any impairments related to a brain injury. There was no documentation of any diagnostic studies to support the presence of a brain injury. Additionally, the records identify that some of her emotional findings were secondary to substance abuse rather than a psychotic disorder. Ms. Andrews responded to the psychological testing in an extremely exaggerated manner, endorsing a wide variety of symptoms and attitudes. Her test taking approach questions the reliability of her self report.

Gov't Ex. 10 at 22.

## 1.      Hearings

On June 20 and 21, 2011, I held a hearing to assess the admissibility of this expert testimony. On the first day, the court heard from Dr. Armstrong. Dr. Armstrong began with a

summary of the conclusions of her report, and she provided an overview of the areas in which Andrews exhibited neurological impairment. Hr'g Tr. 18-19, June 20, 2011 [hereinafter Hr'g Tr. I]. She then identified the causes of Andrews' impairments, namely her history of bipolar disorder, strokes, seizures, head injuries, and drug and alcohol abuse. *Id.* at 24. Defense counsel then asked Dr. Armstrong how Andrews' impairments would affect her ability to read, understand, or remember a document, to which Dr. Armstrong replied:

> [T]here are multiple levels to the difficulty to read and understand and remember a document. And in reference to her particular difficulties, she has, first of all, slowed processing speed so she's, you know, could not be able to take in all the information and actually you know, understand and encode it. Then there's selective attention impairment, both for what she sees as well as what she hears. And so she may not pick up on important words that she reads. There's also memory impairment. There's visuospatial working memory. Working memory is like RAM on a computer. It's just holding information in mind. So she may look at it but not – so, someone, you know, it may ask a question, and then down further there may be a place for an answer, she may not remember what exactly the words were that she's answering. Then there's the associative memory problem which means that a lot of it probably never got into memory to begin with, so that by the time she's done with the form or the writing, she may not remember much of it.

*Id.* at 27-28. Dr. Armstrong stated that Andrews exhibited these impairments during her examination in January of 2010. *Id.* at 27. Dr. Armstrong also testified that these impairments would have been present before 2001, because her impairments (bipolar disorder, strokes, seizures, head injuries, and drug and alcohol abuse) were caused by afflictions Andrews developed well before that date. *Id.* at 25. Finally, Dr. Armstrong opined that Andrews' impairments could have been worse from 2001 through 2005 than they were in 2010, due to the fact that Andrews was not receiving consistent treatment or taking her medications consistently during that time. *Id.* at 26-27.

 In response to subsequent questions from defense counsel, Dr. Armstrong indicated that it was "possible for [Andrews] to read a document and simply just not remember what it says

after she's done reading it," *id.* at 29, that there was "a good chance" that "she would make mistakes in her understanding of a document like [the settlement agreement]." *Id.* at 29-30. Additionally, she commented that it was "possible" that Andrews "would decide to sign [a document like the settlement agreement] if she was told that she should or – and not understand it," *id.* at 30, and that it was "likely" that Andrews would make mistakes in filling out the various forms associated with the Fen-Phen litigation. *Id.* at 31. Furthermore, Dr. Armstrong hypothesized that Andrews "may not understand" that her use of different names "could be confusing or lead to a misunderstanding of some kind of the part of the reader," *id*. at 49.

While Dr. Armstrong and defense counsel went through the various forms completed by Andrews, Dr. Armstrong repeatedly commented that the aberrations found therein were manifestations of Andrews' impairments. *See, e.g.*, *id.* at 32. For instance, Dr. Armstrong pointed out a number of instances of perseveration[2] on the part of Andrews, such as when Andrews wrote "A-N-N-D-D-R-E-E-E-E-E-E" as her last name. *See, e.g.*, *id*. at 116. Also in reviewing the documents, Dr. Armstrong found support for her conclusion that Andrews' impairments were worse during the period when she completed multiple Fen-Phen claims than during her 2010 evaluation "because the handwriting is worse" and shows "dysgraphia," or the "impairment of handwriting." *Id.* at 39. Dr. Armstrong explained:

> There is often a combination of disorders. Often alcohol abuse co-occurs with bipolar, drug abuse co-occurs with bipolar. Clearly, they can have accidents, bipolar individuals, because of their impulsivity can have accidents and their bad judgment and their other impairments. So it's – it looks to me – based on my clinical experience, it looks to me like some sort of alcohol or drug abuse might have been occurring in addition to her bipolar, you know, complicating her underlying bipolar condition at the time she was filling out these forms.

---

[2]  Dr. Armstrong defined perseveration as "when a process that you're writing can't be stopped," explaining that "it's considered pathognomonic of neurological abnormality going back to the 1940's." *Id.* at 37-38. Dr. Armstrong further clarified, "Pathognomonic means that the behavior by itself is abnormal." *Id.* at 38.

*Id.* at 40-41.[3]

On cross-examination, Dr. Armstrong refined some of her claims. Dr. Armstrong stated that she did not know what Andrews understood at any given time, and wished to testify only that mistakes and failures to comprehend or remember were consistent with Andrews' neuropsychological impairments. *Id.* at 59, 65; *see also id.* at 93. Dr. Armstrong indicated that Andrews appeared confused when filling out several forms, and explained that this confusion was likely due to a combination of bipolar disorder, drug and alcohol abuse, head injury, and seizures; however, Dr. Armstrong could not pinpoint which condition or conditions were combining to cause the confusion in any given instance, or to what degree Andrews was in fact confused. *Id.* at 82-84. Finally, although Dr. Armstrong stated repeatedly that Andrews' pathognomonic handwriting indicated neurological abnormality, she conceded that one can be neurologically not normal and still have the capacity to lie, depending on the degree of abnormality in existence at any given moment. *Id.* at 86.

In short, Dr. Armstrong found that Andrews manifested "a huge amount of impairment":

> I've worked clinically with patients over 30 years now and I know how these things affect a person's life, and I know that even mild impairments affect how well a person's able to function. So, it's very clear to me that the extent of impairment that she has would affect her ability to understand a complicated document, a complicated explanation, remember an important situation, various problems like that.

*Id.* at 30-31. Dr. Armstrong stated that Andrews makes a high rate of errors in reading, understanding, remembering, and reasoning through documents, and that if Andrews was less stable from 2001 until 2005 than she was in 2010, then it is highly likely that she did not understand or remember the documents she signed in that time frame. *Id.* at 106-07. However,

---

[3] *See also id.* at 42 ("So the combination of if she has an underlying bipolar disorder and then drinks or abuses drugs, it's likely to worsen her condition and make her less likely to take her meds, rest enough, eat enough, you know, take care of herself. She's likely to have more mania, so it worsens the condition.").

only on one occasion did Dr. Armstrong state definitively that there was a time when Andrews could not possibly have read, understood, or remembered a document such as the ones at issue in this case—that time was in September of 2002 when she was hospitalized for mania, a month during which she signed no documents pertinent to the charges against her. *Id.* at 109.

On the second day of the hearing, Dr. Uram summarized that Andrews had a history of bipolar disorder, addiction to pain medications, alcohol abuse, seizures, head injury, and other cognitive disorders. Elaborating further upon Andrews' bipolar disorder, Dr. Uram explained:

> Type 1 is the more severe version of bipolar disorder. So people that have Bipolar Type 1, which the defendant has, they have disorder or extreme mood, which can include depression. But the main part that separates bipolar from depression is it includes episodes of mania. And the mania can be restricted to discrete periods of time. But in some people, as in Ms. Andrews's case, it can be at a lower grade level, even in between the manic episodes.
>
> And one of the distinguishing factors between Type 1 and Type 2 is that Type 1 interferes in key aspects of their life, like work functioning, interpersonal skills, recreational. So their life can be significantly interrupted or interfered by the particular disorder.
>
> The other differentiating factor between Bipolar Type 1 and Type 2 is that Bipolar Type 1 is often accompanied by psychotic symptoms. Which means the patient can have hallucinations, delusions, you know, be under the influence of hallucinations and delusions, which you don't see in Bipolar Type 2.

Hr'g Tr. 9-10, June 21, 2011 [hereinafter Hr'g Tr. II]. In terms of Andrews' particular impairments due to her Bipolar Type 1, Dr. Uram stated:

> When she's in an episode, she qualifies for a severe extreme of the disorder. When I saw her in my first meeting with her, when she was on her medications, not abusing substances, was not considered in an active manic state, she still had very significant symptoms.
>
> And then from the records, it looks like she can be functioning better than when I saw her. So my best estimate is that her, the severity of her bipolar symptoms ranges between moderate to severe.

*Id.* at 11. As to Andrews' "baseline," Dr. Uram opined that "often in between manic episodes, she has a low grade version of mania," *id.* at 13, and that "her baseline functioning [is] not good," *id.* at 16. Dr. Uram also interviewed Andrews' son, according to whom "her baseline was

highly dysfunctional." *Id.* at 27. Dr. Uram noted elsewhere that seizure disorder, head injuries, neurocognitive problems, and substance abuse can exacerbate the clinical presentation of a bipolar disorder. *Id.* at 23.

In response to questioning from defense counsel, Dr. Uram indicated that "Andrews would have been [at] a greater risk than a normal person for not reading or understanding a legal document like [the] settlement agreement," *id.* at 31, that "there's a very very high degree of likelihood there's no way she could have understood it, and comprehended it fully," *id.* at 32, that Andrews "would have been at greater risk than a normal person for not remembering the content of [the] document . . . if she had received head injuries after having signed it." *Id.* Additionally, Dr. Uram indicated that "[t]here is a much higher likelihood she wouldn't remember reading it or understanding it at a later date compared to somebody that has normal function, normal cognitive and normal emotional functioning," *id.* at 32-33, and that "someone with her conditions [would] be at a greater risk than a normal person to be unable to engage in behavior requiring accurate perception or ability to process information in a sequential, willful, and logical manner." *Id.* at 33. Dr. Uram also added that Andrews was quite impulsive, which would make her much more likely to scan rather than to read a document: "a person that has that constellation of cognitive deficits would much more likely scan and rush through [a document] than read it." *Id.* at 34.

On cross-examination, Dr. Uram clarified that she did not know what Andrews' mental state was "at any given day or week or month." *Id.* at 41. With regard to the settlement agreement, Dr. Uram stated that she was not "rendering a conclusion or an opinion that [Andrews] did not in fact understand it," but was rather suggesting that she was "at a greater risk for not being able to read it . . . and understand it, than a person who doesn't have her disorders."

*Id.* at 89. Dr. Uram also offered that according to Andrews' son, Andrews was highly dysfunctional around the time she first settled with Wyeth, but that "[h]e couldn't pinpoint it very closely." *Id.* at 78. Finally, in response to questioning from the Government, it became clear that Dr. Uram had made an error in her report. As an example of the correlation between Andrews' lawsuit filings and psychiatric treatment, Dr. Uram had cited the January 2003 lawsuit, a psychiatric hospitalization "several months later," and the September 2003 granting of SMI status. Def. Ex. 11 at 9-10. However, the hearing revealed that following the January 2003 lawsuit, there were no psychiatric hospitalizations in 2003. *See* Hr'g Tr. II at 48-64. Andrews also filed lawsuits in April and May 2004, but Dr. Uram conceded on cross-examination that there were no records of hospitalizations, psychotic episodes, or mania during that time. *Id*. at 82.

On July 22, 2011, both parties deposed Dr. Michals via video. Dr. Michals agreed that Andrews suffered from bipolar disorder and had a history of substance abuse and dependence, but expressed his belief that Andrews was able to appreciate the nature and quality of her actions, and had the capacity to deceive. Dep. Tr. 13-14, July 22, 2011. Dr. Michals pointed out that bipolar disorder is "a primarily mood disorder as compared to some other disorders which are primarily cognitive thinking disorders," *id.* at 17, and added that "[l]ying is a cognitive function," meaning that "Andrews's bipolar history did not prevent her from lying." *Id.* at 52. With counsel for the Government, Dr. Michals analyzed Andrews' depositions in detail, offering his opinion that she displayed intact cognition and manifested an intent to deceive at both:

> Depositions are a question-and-answer process basically. And when I read her depositions, her answers primarily were goal directed, meaning – what I mean by that, she was asked Question A and responded with Answer A. So that's helpful to know because it's – basically the question and answering is a cognitive state. Basically, you have to, first of all, understand and hear the question. You hear it. You understand the question. You respond with an answer. You go

through your brain file if you wouldn't express that. So it's a complicated
biological process, neurological process, but she was able to do that.

  So her deposition testimony was not disorganized. She was not scattered
all over the place responding to internal stimuli. It was goal directed. So that's
intact cognition.

*Id.* at 22. Dr. Michals further testified that as for her deceit, Andrews was asked why she lived in

Kentucky for a time, to which she responded that she had requested federal medical assistance

and had moved there to spend a few months in a federal medical facility for TMJ surgery. In

reality, she had been incarcerated in connection with mail fraud. *See id.* at 25-30. Andrews

admitted her imprisonment to both Dr. Uram and Dr. Michals during her evaluations, indicating

that she remembered its existence, which suggests that she was engaging in deliberate deception

at her deposition. *Id.*

  Unlike Dr. Uram, Dr. Michals found no correlation between Andrews' filing of lawsuits

and psychiatric hospitalizations. *Id.* 42-45. Dr. Michals also opined that Andrews had the

capacity to understand that she had settled and resolved her lawsuit with Wyeth. *Id.* at 49.

Contrary to the testimony of the defense experts, Dr. Michals found indications of intact

mentation, and submitted that Andrews could process information in a sequential, willful, and

logical manner. *Id.* at 51.

  **V.**  **Legal Standard**

  A district court "has broad discretion to admit or exclude expert testimony, based upon

whether it is helpful to the trial of fact." *United States v. Bennett*, 161 F.3d 171, 182 (3d Cir.

1998).  This includes the "broad discretion to exclude expert testimony that is not offered as part

of an insanity defense or to negate the *mens rea* element of a crime." *United States v. Baxt*, 74 F.

Supp. 2d 436, 441 (D.N.J. 1999). "Th[e] burden of showing that proffered testimony is offered

to negate the *mens rea* element of a crime and not in support of some improper defense theory falls squarely on the defendant." *Id.*

In 1984, Congress passed the Insanity Defense Reform Act ("IDRA"), making it "an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts," and legislating that "[m]ental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17(a). The IDRA thus abolished the volitional prong of the Model Penal Code approach to insanity, "which had permitted acquittal if the defendant 'as a result of mental disease or defect . . . lacks substantial capacity . . . to conform his conduct to the requirements of the law.'" *United States v. Pohlot*, 827 F.2d 889, 896 (3d Cir. 1987) (quoting Model Penal Code § 4.01 (1962)). The IDRA "also shifted the burden of proof, requiring the defendant to prove insanity by clear and convincing evidence." *Id.*; *see also* 18 U.S.C. § 17(b).

In *Pohlot*, the Court of Appeals for the Third Circuit addressed whether any evidence of mental abnormality remained admissible after passage of the IDRA. The *Pohlot* court distinguished between three types of evidence: (1) "evidence of mental abnormality to negate mens rea"; (2) evidence of mental abnormality that shows the defendant "lacked the *capacity* to form the mens rea"; and (3) evidence of mental abnormality to demonstrate that the defendant is less culpable and deserves mitigated punishment. 827 F.2d at 903-04. The court determined that, after the IDRA, only the first type of evidence, evidence of mental abnormality to negate mens rea, is admissible. *Id.* at 905. Therefore, "[e]xpert psychiatric testimony concerning 'unconscious motivation,' 'impaired volitional control,' or an 'inability to reflect on the ultimate consequences of one's conduct' is inadmissible." *Baxt*, 74 F. Supp. 2d at 440 (quoting *United*

*States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990)). Unlike the other two types of

evidence, evidence of mental abnormality to negate mens rea is admissible because it is not a

"diminished capacity" or "diminished responsibility" defense, "but merely a rule of evidence,"

*Pohlot*, 827 F.2d at 903, that is relevant to the determination of whether the Government has

established the intent element of a crime.

 "A lack of self-reflection does not mean a lack of intent and does not negate mens rea"

because:

> Criminal responsibility must be judged at the level of the conscious. If a person
> thinks, plans and executes the plan at that level, the criminality of his act cannot
> be denied, wholly or partially, because, although he did not realize it, his
> conscious was influenced to think, to plan and to execute the plan by unconscious
> influences which were the product of his genes and his lifelong environment.

*Id.* at 906 (internal quotation marks omitted). "Evidence offered as psychiatric evidence to

negate such specific intent is admissible . . . when such evidence focuses on the defendant's

specific state of mind at the time of the charged offense." *Cameron*, 907 F.2d at 1067 (internal

quotation marks omitted). In analyzing whether expert testimony on mens rea is admissible,

"[t]he proper focus should be on the proffered link or relationship between the specific

psychiatric evidence offered and the *mens rea* at issue in the case." *Id.* at 1067 n.31; *see also*

*United States v. Childress*, 58 F.3d 693, 730 (D.C. Cir. 1995)) (quoting same).

In assessing the proffered link, "courts should evaluate the testimony outside the

presence of the jury." *Pohlot*, 827 F.2d at 906. "[T]he Congressional prohibition of diminished

responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing

on mens rea." *Bennett*, 161 F.3d at 184. "Presenting defense theories or psychiatric testimony to

juries that do not truly negate mens rea may cause confusion about what the law requires." *Id.*

Because of the "strong danger of misuse" of this evidence, "district courts [are] to examine

proffered psychiatric testimony carefully to determine whether the proof offered is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in deciding the ultimate issues." *Pohlot*, 827 F.2d at 905 (internal quotation marks omitted). "Conclusory statements by a defendant about the link between psychiatric evidence and the defendant's *mens rea* at the time the alleged crime was committed do not render the evidence admissible." *Baxt*, 74 F. Supp. 2d at 440 (citing *Bennett*, 161 F.3d at 181, 185). Thus, "[d]istrict courts should admit evidence of mental abnormality on the issue of mens rea only when, if believed, it would support a legally acceptable theory of lack of mens rea." *Pohlot*, 827 F.2d at 905-06.

Even if expert testimony is relevant to a legally acceptable theory of lack of mens rea, it will be admitted only if it satisfies the requirements of Rules 403 and 702 of the Federal Rules of Evidence.[4] *Baxt*, 74 F. Supp. 2d at 441; *see also United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997).

## VI. Discussion

The offenses alleged in this case are mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343. According to these statutes, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," is guilty of a crime if he uses the mail or wire "for the purpose of executing such scheme or artifice." *See id.*; *see also United States v. Mezvinsky*, 206 F. Supp. 2d 661, 668 (E.D. Pa. 2002). An essential element of mail or wire fraud that the Government must establish beyond

---

[4]  Rule 403 of the Federal Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Rule 702 of the Federal Rules of Evidence permits expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue," and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

a reasonable doubt is that the defendant possessed the specific intent to defraud.[5] *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004). "To act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat." Mod. Crim. Jury Instr. 6.18.1341-4.

Andrews requests permission to present expert testimony at trial to support her theory that, as a result of her mental abnormality, she lacked the specific intent to defraud and therefore cannot be convicted of mail or wire fraud because the Government has not established the requisite mens rea for these offenses. Both parties agree that expert testimony on mental abnormality to negate mens rea is admissible. Additionally, both parties agree that the key question is whether "Andrews had the requisite intent on the dates and times that she committed the substantive acts as outlined in the indictment." Resp. 15; *see also* Gov't's Concluding Mem. 13.

The Government seeks to exclude the expert testimony because it contends that while the testimony established that Andrews has bipolar disorder, it does not support a finding that Andrews was actually suffering from symptoms of the disorder at the times she allegedly committed the fraudulent acts. Additionally, the Government argues that the symptoms described by Andrews' experts do not negate her intent to defraud.[6] Lastly, the Government

---

[5]  The Government concedes in its reply brief that "[t]he mens rea for these offenses is that Andrews acted with the 'intent to defraud.'" Reply 5-6. This concession directly conflicts with its argument in the initial brief that "purposeful activity" satisfies the mens rea element of these offenses. The Government has rightfully abandoned its contention that the proper mens rea is "purposeful activity." Although in *Pohlot*, the court stated that "purposeful activity is all the law requires," 827 F.2d at 907, that statement was made in regard to the mens rea required for a murder charge. "[R]eading the sentence in context reveals, the *Pohlot* court was merely explaining that where intent to kill is the element of the offense that a Defendant seeks to disprove with psychological testimony, evidence of unconscious motives is irrelevant, especially if a Defendant concedes he acted with a purpose to kill. . . . Purposeful action is all that the law required to show legal intent under the statute with which Pohlot was charged in that case." *United States v. Mister*, 553 F. Supp. 2d 377, 384 (D.N.J. 2008) (citation omitted). Unlike in *Pohlot*, Andrews is charged with mail and wire fraud. It is indisputable that the Government must prove that Andrews possessed the specific intent to defraud in order to convict Andrews of these offenses.

[6]  To the extent that the Government argues that the expert testimony should be excluded because Andrews' experts did not provide testimony to support that Andrews' lacked the general capacity to deceive, this argument misstates the law. According to *Pohlot*, expert testimony of mental abnormality to establish that a defendant "lack[s] the

asserts that the expert testimony, if permitted, could lead the jury to conclude that Andrews' mental abnormality excuses her conduct, a defense prohibited by the IDRA and *Pohlot*. Thus the Government asserts that the expert testimony is inadmissible under *Pohlot*. Alternatively, the Government seeks to exclude this testimony under Federal Rules of Evidence 403 and 702.

Andrews has not identified a single case in which a federal court has allowed expert testimony regarding a defendant's bipolar disorder in order to negate mens rea. This is not surprising given that courts have generally rejected expert testimony on bipolar disorder to negate mens rea. *See, e.g., United States v. Worrell*, 313 F.3d 867 (4th Cir. 2002) (affirming exclusion of expert testimony about a defendant's bipolar disorder that was intended to negate mens rea); *United States v. Armstrong*, No. 07-26-1, 2010 WL 4275232 (W.D. Pa. Oct. 25, 2010) (same); *United States v. Smith*, No. 09-158-1, 2009 WL 5174231 (S.D. Ala. Dec. 21, 2009) (same); *United States v. Sacks*, No. 08-269, 2009 WL 4114169 (D.N.J. Nov. 23, 2009) (same); *United States v. Dupre*, 339 F. Supp. 2d 534 (S.D.N.Y. 2004) (same); *Mezvinsky*, 206 F. Supp. 2d 661 (same); *United States v. Agnello*, 158 F. Supp. 2d 285 (E.D.N.Y. 2001) (same); *Baxt*, 74 F. Supp. 2d 436 (same). After considering the experts' testimony and written reports, as well as the written submissions of the parties, I conclude, adopting similar reasoning to that of my colleagues, that the expert testimony on bipolar disorder in this case should be excluded.

The expert testimony that Andrews would like to introduce at trial fails to negate Andrews' intent to defraud. Moreover, if this testimony were presented to the jury, there is a strong likelihood that it would impermissibly serve to excuse Andrews' conduct.

---

*capacity* to form the mens rea" is impermissible. 827 F.2d at 903, 905. The crucial question is whether Andrews possessed the specific intent to deceive at the relevant times. Actual mens rea is what the Government must ultimately prove, and actual mens rea is what defendants can submit expert testimony on under limited circumstances according to *Pohlot*. A person with the capacity to deceive may tell a lie without knowledge that the statement is false. In such a scenario, that person lacks the specific intent to deceive. The experts' statements that Andrews had the capacity to deceive do not dictate the result in this case.

Some of the testimony that Andrews' would like to present must be excluded because it does not logically negate Andrews' intent to defraud. The rest of the evidence, although arguably logically related to Andrews' intent to defraud must be excluded because, due to the episodic nature of bipolar disorder, the experts cannot establish whether Andrews was suffering from the disorder to such an extent that it negated her intent to defraud at the times she allegedly committed the crimes.

Several courts have rejected expert testimony on bipolar disorder because the testimony was not logically connected to the mens rea at issue. In *Baxt*, the defendant was charged with misrepresenting his financial assets on loan applications to Summit Trust. 74 F. Supp. 2d at 438. The expert testified that the defendant's bipolar disorder harmed his ability to think logically, and caused him to have grandiose notions, act impulsively, lack judgment, and lack awareness of the true nature and consequences of his actions. *Id.* at 441. The court held that the expert testimony was inadmissible because it did not speak to the requisite mens rea for the offenses; specifically, whether the defendant knew "that he filed false statements or . . . intend[ed] to influence the action of the bank through the submission of those statements." *Id.* at 442-43. According to the court, "[t]hat Baxt may have been overcome by certain passions that are the product of mental illness – an impulse for grandiosity or poor judgment, for example – does not demonstrate that Baxt did not know that the financial statements he submitted to Summit Trust were false," or "that Baxt did not intend to influence the actions of Summit Trust . . . ." *Id.* at 441-42. Rather, the court found that this was precisely the type of testimony that the court sought to exclude in *Pohlot* because it "suggests that Baxt should be excused for his behavior because his mental illness inspired in him some kind of unconscious impulse to spend – not because he lacked the state of mind to commit the crime with which he is charged." *Id.* at 443.

In *Sacks*, the defendant was charged with, among other things, mail and wire fraud. 2009 WL 4114169, at *1. The defendant sought to introduce expert testimony that, as a result of bipolar disorder, he was unable to exercise good business judgment because he had deficiencies in concentration, pace, and persistence. *Id.* at *6. The court excluded this testimony because the "conclusion that Defendant's business judgment is affected is precisely the type of psychological evidence that *Pohlot* prohibits as it in no way relates to an intent to deceive . . . ." *Id.*

Similar to *Baxt* and *Sacks*, in *Armstrong*, the court held that expert testimony on the defendant's bipolar disorder was inadmissible because it did "not logically negate the mens rea required" for the offenses. 2010 WL 4275232, at *5-6. The defendant had sought to introduce expert testimony that his bipolar disorder made him "predisposed to impulsive and unpredictable behavior, a loss of control, and irrational thinking . . . ." *Id.* at *6. In rejecting this testimony as irrelevant to the mens rea required for the offenses, the court noted that whether the defendant's "mental conditions cause her to act impulsively . . . or cause her to see things in her own idiosyncratic way . . . focuses not on the Defendant's conscious mind, but on her unconscious. This is contrary to *Pohlot's* admonishment that criminal responsibility must be judged at the conscious level." *Id.*

In line with the cases discussed above, the court in *Agnello* held evidence that the defendant's bipolar disorder caused him to race or speed up was inadmissible because it was irrelevant to his intent, and was "aimed, not at negating intent, but rather at suggesting that the defendant was unable to control his actions, an issue which Congress has expressly excluded as a defense." 158 F. Supp. 2d at 287-88. Additionally, the court excluded expert testimony that the defendant's bipolar disorder resulted in a loss of control of his impulses and temper because these characteristics were irrelevant to the defendant's intent to commit the offenses. *Id.* at 288.

In this case, there are several symptoms of Andrews' bipolar disorder that the defense would like to introduce at trial that do not logically negate Andrews' intent to defraud and therefore are inadmissible. The list of "neuropsychological impairments" provided by Dr. Armstrong is inadmissible because none of these impairments logically supports the conclusion that Andrews' did not have the intent to defraud at the time she allegedly committed the offenses. Similarly, Dr. Armstrong's testimony that Andrews' had pathognomonic handwriting, such as writing her last name as "A-N-N-D-D-R-E-E-E-E-E-E," is inadmissible because, while Dr. Armstrong indicated that pathognomonic handwriting indicated neurological abnormality, she conceded that one can be neurologically not normal and still have the capacity to lie. Therefore, any testimony regarding Andrews' pathognomonic handwriting does not speak to whether Andrews' possessed the intent to defraud, the requisite mens rea for her alleged crimes. Lastly, both experts' references to Andrews' impaired judgment and lack of impulse control must be excluded. For example, in her report, Dr. Uram opined that "[i]f [Andrews] had periods of time where she was able to form an intent to wrongfully file lawsuits, she was concurrently suffering from very impaired judgment and impulse control problems, all secondary to psychotic and manic symptoms." Def. Ex. 11 at 10. Not only is this testimony regarding Andrews' impulsivity and poor judgment irrelevant to whether she possessed the intent to defraud, it also impermissibly serves to excuse Andrews' conduct.

If the jury were to excuse Andrews' conduct, this would violate *Pohlot*'s and the IDRA's express prohibition of diminished capacity or diminished responsibility defenses. *See* 827 F.2d at 903. In *Pohlot*, the court explained that "[c]riminal responsibility must be judged at the level of the conscious," and cautioned against allowing any mens rea evidence that would excuse a defendant "because, although he didn't realize it, his conscious was influenced to think, to plan

and to execute the plan by unconscious influences which were the product of his genes and his lifelong environment." 872 F.2d at 906 (internal quotation marks omitted). Whether Andrews' "mental conditions cause her to act impulsively . . . or cause her to see things in her own idiosyncratic way . . . focuses not on the Defendant's conscious mind, but on her unconscious. This is contrary to *Pohlot's* admonishment that criminal responsibility must be judged at the conscious level." *Armstrong*, 2010 WL 4275232, at \*6.

In addition to the evidence discussed above, Andrews would like to present expert testimony to the effect that because of her bipolar disorder she was unable to read, understand, reason through, and remember the relevant trust documents, including her 2001 settlement agreement. While this testimony is logically related to whether Andrews' lacked the intent to defraud, I find it is inadmissible because of its highly speculative nature.[7]

"[P]sychiatric evidence to negate specific intent is admissible . . . when such evidence focuses on the defendant's specific state of mind at the time of the charged offense." *Cameron*, 907 F.2d at 1067 (internal quotation marks omitted). Several courts have excluded expert

---

[7]    Andrews relies on cases like *United States v. Hayden*, 64 F.3d 126 (3d Cir 1995), to argue "that mental health evidence that goes to knowledge and intent to deceive is admissible." Resp. 10 . In *Hayden*, the defendant was charged with purchasing a gun while under an indictment, a crime that requires willfulness. The defendant argued that he could not be found guilty because he did not know that he was under an indictment when he purchased the gun. The Court of Appeals for the Third Circuit noted that "[e]vidence of low intelligence and reading ability is generally relevant in determining knowledge and is usually a jury question." *Id.* at 134. The court found that "Hayden's knowledge of whether he was under an indictment or information was central to his defense and indispensable to the factfinder in assessing whether he willfully violated § 922(n)." *Id.* As a result, it held that the district court erred in preventing Hayden from offering evidence of his low intelligence and reading ability.

The defense is correct that evidence of low intelligence can be relevant and admissible in cases where the Government must prove knowledge; however, *Hayden* is distinguishable from Andrews' case and does not compel the admission of expert testimony here. Where evidence of a defendant's inability to understand has been admitted, the defendant's inability to understand was due to long-term and permanent low intelligence. In this case, the defendant's inability to understand is largely episodic, due to a combination of mental disease, substance abuse, head injury, and failure to take medication. Moreover, it is largely unknown whether Andrews suffered from any inability to understand during the time period in which she filed each claim. The experts never stated that, at all times, Andrews was so cognitively impaired that she was unable to process the relevant information. Andrews' proposed expert testimony is vastly different from the expert testimony admitted in *Hayden* because, as the experts agree, unlike low intelligence, Andrews' conditions either lack permanency or they are episodic.

testimony on bipolar disorder because the expert was unable to establish with any certainty whether the defendant was suffering from symptoms of bipolar disorder at the time of the commission of the alleged offenses. For instance, in *Smith*, the court concluded that it was appropriate to exclude expert testimony on the defendant's bipolar disorder because the expert's "opinions do not focus on Defendant's state of mind at the time the offense was committed; rather, his opinions consist of vague statements about symptoms of illnesses . . . [that] Defendant may have had when he committed the acts." 2009 WL 5174231, at *2. According to *Smith*, the expert's statement that there was a "high probability" that the defendant suffered from the symptoms of bipolar disorder at the time the crimes were committed, "puts it at odds with the . . . require[ment] [of] precise evidence focused on the Defendant's mind during the crime." *Id.*

Similar to *Smith*, in *Agnello*, the court concluded that in addition to lacking any logical relationship to the mens rea at issue, the expert's testimony was inadmissible because the defendant's bipolar disorder symptoms were not specifically tied to the dates he allegedly committed the crimes. 158 F. Supp. 2d at 289. According to *Agnello*, "merely showing that [the defendant] had a particular condition over a three and a half year period, which was sometimes controlled by medication, cannot be sufficient basis for arguing to the jury that specific charged instances of criminal conduct were not intended by the defendant." *Id.*

Lastly, in a case quite similar to Andrews', the court in *Mezvinsky* addressed whether a defendant charged with various crimes, including mail and wire fraud, that occurred over a twelve-year period, could present expert testimony that his bipolar disorder prevented him from forming the specific intent to commit the offenses. 206 F. Supp. 2d at 662-63. The court explained, "In order to have probative value as to mens rea, defendant's expert testimony must relate to the particular misrepresentations attributed to him in the indictment." *Id.* at 665.

Therefore, the court concluded that Mezvinsky's mens rea defense "must be probative as to whether he had the mental capacity to form such an intention over the twelve-year course of his alleged two dozen schemes to defraud." *Id.* at 668.

In *Mezvinsky*, all experts agreed that bipolar disease was episodic in nature. *Id.* at 672. While one expert testified that "there were unusual cases where extreme bipolar disorders took the patients beyond cognition of reality," he recognized that "those episodes were always brief," and "was aware of no case where the episode lasted beyond a few days." *Id.* "No expert could think of a single case where a bipolar patient was so divorced from reality that the condition persisted without interruption over a period of years, as is the claim here." *Id.* Moreover, "no expert on Mezvinsky's behalf was in a position to say that at any given time during the twelve-year history of the alleged schemes to defraud that Mezvinsky did not have a capacity to deceive." *Id.* Judge Dalzell noted that no court in any reported decision has "upheld a mens rea defense when the criminal activity spanned more than a week," but that there are "several cases where mens rea defenses were disallowed when the conduct in question was done over extended time periods." *Id.* at 672 n.13. Ultimately, the court held that expert testimony as to Mezvinsky's bipolar disorder was inadmissible because although expert witnesses were "prepared to testify at length that Mezvinsky's condition resulted in 'poor judgment' and 'bad choices', . . . none [was] in a position to state that, at any relevant time, Mezvinsky did not have the capacity to deceive." *Id.* at 672-73.

Andrews' case requires a similar conclusion to that reached in *Smith, Agnello*, and *Mezvinsky*. As in *Mezvinsky*, all experts agree that Andrews' bipolar disorder is an episodic condition. Her alleged scheme to defraud spanned more than four years, and all experts recognize that her condition did not persist uninterrupted during this time period. While Dr.

Armstrong testified that when Andrews' bipolar disorder was at its worst she could not have read, understood a document, or remembered it, neither of Andrews' experts could state what Andrews' mental capacity was at any relevant time. The closest link that Dr. Uram could identify between Andrews's bipolar disorder and her alleged offenses was that Andrews filed a lawsuit against Wyeth in early 2003, and received SMI status several months later, at which time she reported not having taken her medication. *Id.* The long temporal gap between these events, general lack of detail, and invitation to speculate constitute an insufficient link between Andrews' bipolar disorder and her actual mens rea at the time she allegedly committed the offenses. The expert testimony reveals that Andrews' functionality spans a wide spectrum, and that neither defense witness knows where she was on that spectrum at the time she allegedly committed the charged offenses. Thus the experts' testimony on Andrews' bipolar condition is not sufficiently tied to the relevant dates upon which she allegedly committed the offenses.

Dr. Uram and Dr. Armstrong stated only that it was "possible" that at any relevant time Andrews' mental state was such that she may have either lacked knowledge or the intent to deceive. To admit such evidence would be to accept conclusory statements and to invite speculation. However, "[c]onclusory statements by a defendant about the link between psychiatric evidence and the defendant's *mens rea* at the time the alleged crime was committed do not render the evidence admissible." *Baxt*, 74 F. Supp. 2d at 440. Quite simply, "[m]erely conclusory or speculative testimony is not enough." *United States v. Bennett*, 29 F. Supp. 2d 236, 238 (E.D. Pa. 1997), *aff'd* 161 F.3d 171 (3d Cir. 1998). The expert testimony regarding Andrews' bipolar disorder shall be excluded because the experts are unable to provide the necessary link between Andrews' symptoms and the dates she allegedly committed the offenses.[8]

---

[8]   While the experts testified at length that Andrews was likely to struggle in her understanding and reading of documents in 2001, 2002, and 2003, none opined that Andrews was unable to understand or remember filing lawsuits in 2004. Additionally, none of the experts opined that Andrews was cognitively impaired during her

## VII.   Conclusion

For the foregoing reasons, I will grant the Government's motion to exclude Defendant's psychiatric and psychological evidence.[9]

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to:

O:/ABB 2011/L-Z/USA v. Andrews, Memorandum re Motion in Limine.pdf

---

depositions in 2005.  This is because Andrews was more psychologically stable from 2004 onward.  Moreover, there is evidence in the record, that in 2004, Andrews clearly remembered her first settlement, yet continued to cause her attorneys to file additional suits against Wyeth. *See, e.g.*, Gov't Ex. 1 at 14 (On January 8, 2004, Value Options noted, "[Andrews] reports getting a settlement which she has spent. She also said that she was put on Fhen-Fhen [sic], where she also received a six figure settlement which has also been spent."). That none of the experts testified that Andrews was too cognitively impaired to understand or remember in 2004 and 2005 provides yet another basis for me to exclude this testimony, given that the charged incidents of mail and wire fraud all occurred in 2004 and 2005.  Lastly, I note that four of the six incidents of fraud occurred during Andrews' deposition;  it is very difficult to imagine that Andrews' did not remember her settlement at the time she was deposed given her response of "Shit," when she was presented with the signature page of her 2001 settlement with Wyeth.

[9]  Because I hold that the expert testimony is inadmissible under *Pohlot*, I do not need to address whether this evidence would satisfy the requirements of Rules 403 and 702 of the Federal Rules of Evidence.